IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 09-cv-00180-PAB

JAVAN A. GADLIN, JR.,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of the Social Security Administration,

    Defendant.

---

# ORDER

---

This matter comes before the Court on plaintiff Javan A. Gadlin's complaint [Docket No. 3], filed on January 29, 2009. Plaintiff, through counsel, seeks review of the final decision of defendant Michael J. Astrue (the "Commissioner") denying plaintiff's claim for supplemental security income. The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).[1] For the following reasons, the Court will reverse the Commissioner's decision and remand this case for further proceedings.

## I. BACKGROUND

Mr. Gadlin applied for disability benefits on December 14, 2006, alleging he was unable to work beginning June 1, 2006 due to a learning disability. At the time of his application, he was nineteen years old. While his application was pending, he suffered

---

[1] Neither party requested oral argument. *See* Joint Case Management Plan [Docket No. 10] ¶ 9.

a gunshot wound to his right forearm on February 17, 2007 as a bystander outside a bar.  After Mr. Gadlin's claim was initially denied, an administrative law judge ("ALJ") held a hearing on July 17, 2008.  At the hearing, Mr. Gadlin amended the onset date of his disability to February 17, 2007, the date he suffered the gunshot wound.

The ALJ found, in a decision dated September 5, 2008, that "claimant has the following severe impairments: a learning disorder with borderline intellect, and status post fracture of the upper right extremity."  R. at 13 (citing 20 C.F.R. § 416.920(c)). Plaintiff's impairments did not, alone or in combination, meet or equal one of the listed impairments in the regulations.  R. at 13.  The ALJ concluded that plaintiff retained the residual function capacity ("RFC") to

> perform a range of modified light work as defined in 20 C.F.R. [§] 416.967(b). He can sit and/or stand/walk for at least 6 hours each during an 8 hour workday, but is limited to lifting and carrying no more than 10 pounds.  He should also limit all exposure to extreme temperature changes.  The claimant cannot perform tasks involving skill levels greater than SVP ["Specific Vocational Preparation"] 2, or with GED ["General Educational Development"] levels exceeding 1, 2, or 3.

R. at 14.[2]  Based on these findings, the ALJ determined that Mr. Gadlin could perform jobs existing in significant numbers in the national economy, R. at 18, and, therefore,

---

[2]*See Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) ("The Dictionary of Occupational Titles, which is published by the U.S. Department of Labor and relied on by the Commissioner for vocational information, assigns an SVP to each job it lists. SVP is defined as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'") (citations omitted); *Malusa v. Astrue*, No. CV 07-655-TUC-CKJ (CRP), 2009 WL 2707219, at *4-5 (D. Ariz. Aug. 25, 2009) ("The GED levels 'embrace[] those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.  This is education of a general nature which does not have a recognized, fairly specific occupational objective.'") (citing *Dictionary of Occupational Titles*, App. C. § III.).

Mr. Gadlin was not disabled. R. at 19. On January 9, 2009, the Appeals Council declined review, making the ALJ's decision the final decision of the Commissioner. R. at 1-3.

## II. ANALYSIS

### A. Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003). The district court may not reverse an ALJ simply because the court may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The district court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty*, 515 F.3d at 1070. Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d

1482, 1487 (10th Cir. 1993).

## B. The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable physical or mental impairment expected to result in death or last for a continuous period of twelve months that prevents the claimant from performing any substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(1)-(2).

Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006). The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). The steps of the evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from doing his past relevant work; and (5) whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R. § 404.1520(b)-(f)). A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

4

The claimant has the initial burden of establishing a case of disability. However, "[i]f the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience." *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987). While the claimant has the initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts." *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

### **C. The ALJ's Decision**

Mr. Gadlin raises three arguments on appeal: (1) "The ALJ improperly rejected the opinion of Mr. Gadlin's treating physician and further erred by assessing no limitation on Mr. Gadlin's ability to perform manipulative activities with his dominant upper extremity"; (2) "The ALJ erred in his assessment of Mr. Gadlin's credibility"; and (3) The ALJ [f]ailed to [p]roperly [e]valuate the [i]mpact of Mr. Gadlin's [c]ognitive [d]eficits." Pl.'s Opening Br. [Docket No. 13] at 1.

The Social Security Administration regulation governing evaluation of opinion evidence in cases involving a supplemental security income benefit claim is 20 C.F.R. § 416.927. That section ensures that the Commissioner "will always consider the medical opinions in [a claimant's] case record" and "make findings about what the evidence shows." 20 C.F.R. § 416.927(b)-(c). Explaining how an ALJ will weigh medical

5

opinions, subsection 416.927(d) lists the following factors to be considered: examining relationship, treatment relationship, supportability, consistency with the record as a whole, and specialization. A treating source may be given controlling weight among the medical evidence in a claimant's case record under certain circumstances. *Id.* at § 416.927(d)(2). Whether a treating source is given controlling weight or not, the regulation guarantees that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* Subsection 416.927(f), which details how an ALJ is to consider opinions of nonexamining sources or state agency medical and psychological consultants, provides:

> Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 C.F.R. § 416.927(f)(2)(ii).

In short, 20 C.F.R. § 416.927 makes clear that in every case involving supplemental security income benefits the Commissioner will weigh all medical opinion evidence and set forth the reasons why a particular weight was assigned to treating sources and other medical sources. Failure to follow this rule by not providing adequate reasons for an ALJ's decision constitutes reversible error. *See Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir. 1988).

The ALJ's decision in this case falls short of these requirements. The ALJ relies on the opinion of the state agency medical consultant, Ruth Potter. R. at 15. On March

6

13, 2007, the consultant[3] "completed a Physical Residual Functional Capacity Assessment" and determined that Mr. Gadlin "could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; sit with normal breaks for a total of about six hours in an eight hour workday; with an unlimited ability to push and/or pull other than that shown for lift and carry." R. at 15-16; *see* R. at 170. The consultant concluded, in the words of the ALJ, that Mr. Gadlin's "condition was expected to improve consistent with the RFC provided." R. at 16.

The medical evidence following this assessment indicates that Mr. Gadlin's condition did not improve. In fact, Mr. Gadlin needed to undergo a second surgery on his arm in April 2007. The ALJ's opinion reveals that the ALJ apparently worked under the assumption that the arm would inevitably improve or, at a minimum, get no worse after his surgeries. The ALJ may not reach that medical diagnosis without relying upon the medical evidence of record.

The medical evidence reveals that the month after his second surgery, Dr. Bierbrauer, a treating source, found Mr. Gadlin to be "doing well" and "improving." R. at 206. Around the same time, a Dr. Gregory Unruh, D.O., at Peak Vista Community Health Centers wrote a letter indicating that Mr. Gadlin's right arm was "unusable," making it "difficult" or "impossible to work and to perform in school not only because of loss of function but from side effects of medication for pain." R. at 207. In July 2007, Dr. Bierbrauer, a treating source, noted that Mr. Gadlin was "doing much better,"

---

[3]It is not clear from the record whether the consultant is a medical doctor.

"note[d] less pain and better range of motion," and was "more functional." R. at 205. During that visit, Mr. Gadlin also "note[d] progression of his sensation into the tips of his fingers." R. at 205. Dr. Bierbrauer believed Mr. Gadlin's fractures had healed and that "he should expect nerve return for at least the next six months."[4] R. at 205.

The record includes evidence that Mr. Gadlin's condition did not improve as expected. By October 2007, Dr. Unruh noted "muscle wasting," a "loss of grasp strength," and that the right arm was "painful to touch." R. at 223. A month later, Mr. Gadlin reported that the pain had worsened. R. at 219. Dr. Unruh, upon examination, noted that "atrophy is present but it is difficult to tell if it is worse," and that the right arm was "sensitive to light touch." R. at 220. In December 2007, Dr. Unruh indicated that Mr. Gadlin had a "hard projection of the ulnar surface," that was "non[-]moveable and [was] painful." R. at 279. Mr. Gadlin's right arm remained "very painful to touch." R. at 279. Mr. Gadlin reported in January 2008 that the pain had worsened still. R. at 275. Dr. Unruh noted that the right forearm was still painful to the touch, particularly in the region of the bony growth. R. at 276. By the end of that month, things were "getting worse." R. at 273.

A treating source, Dr. Nicholas Christoff, noted in March 2008 that physical "therapy didn't work out and seemed to make [Mr. Gadlin] worse . . . ." R. at 289. Dr.

---

[4]The record includes a note from Dr. Bierbrauer dated March 2, 2007. Dr. Bierbrauer opines that "Mr. Gadlin will be unable to push, pull, or lift with his right arm for 2 months." R. at 182. On the next page of the record, a duplicate copy of this note appears in which a "1" is written in front of the "2," indicating an inability to use the arm for 12 months. R. at 183; see Pl.'s Reply Br. [Docket No. 15] at 2. On remand, to the extent relevant to his determination, the ALJ should determine the import, if any, of this discrepancy.

8

Christoff added that the "arm is uncomfortable and not very usable," and that Mr. Gadlin "can't do much with it." R. at 289. The doctor noted the possibility that Mr. Gadlin was suffering from complex regional pain syndrome and recommended a bone scan. R. at 289. In April 2008, after the bone scan, Dr. Christoff indicated that Mr. Gadlin did not appear to have complex regional pain syndrome, but was a candidate for developing it. R. at 288. In late May 2008, Mr. Gadlin was still experiencing "severe pain in his right forearm," and was "not able to do much with the arm at all." R. at 287. As of the May visit, it still did "not appear to be complex regional pain syndrome." R. at 287. Dr. Christoff concluded that Mr. Gadlin "might benefit from an orthopedic evaluation at this time since he was told there was a possibility that further surgery, particularly in that tender area, could be of benefit." R. at 287.

The ALJ did not address what impact this medical evidence had on his decision. Instead, he relied on the March 2007 assessment by the state agency consultant and then discounted a May 2008 Ability to do Work-Related Activities form completed by Dr. Christoff. The form, however, was one piece of evidence out of the many noted above. The ALJ focused almost exclusively on the form completed by Dr. Christoff, noting that Dr. Christoff was not able to conduct tests on the arm, thus undermining the conclusion that the arm was "useless due to pain." R. at 236. The clear implication of the notations, however, is that Dr. Christoff was unable to conduct tests because of the severity of the pain it would cause Mr. Gadlin. *See* R. at 236 (writing in section regarding "how much your patient can lift/carry in a competitive work environment," "R Arm Useless due to pain . . . Not Tested. Can't evaluate!"); *id.* (in regard to "the maximum amount of time your patient can use their upper extremities to perform the

9

following repetitive activities in a competitive work situation: 'Not tested – Can't evaluate! Disabled by chronic pain – everything he does makes it hurt worse'"). The ALJ also noted that Dr. Christoff indicated that a return to work would not cause the condition to deteriorate. That opinion, however, is not necessarily inconsistent with the doctor's opinions that the pain will prevent Mr. Gadlin from being a reliable and consistent worker. *See* R. at 237. Furthermore, to the extent it is an inconsistency, the ALJ is not permitted to rely on that one circled answer to a question at the exclusion of any discussion of the rest of the treating sources' opinions regarding Mr. Gadlin's deteriorating condition as of the spring of 2008. *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("'The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.") (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984).

In short, in rejecting Dr. Christoff's opinion, the ALJ appears to have limited his consideration to Dr. Christoff's form and a comparison of it to treatment notes from a year before.[5] R. at 16. If an ALJ rejects a treating physician's opinion, "he must articulate specific, legitimate reasons for his decision." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). It has long been the law in the Tenth Circuit that "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly

---

[5]The ALJ also noted that his "physical therapy records show that he had 4 cancelled appointments and 6 'no-shows.' It was noted that the claimant was able to get along without the brace on his arm, and also that he could grip 30 pounds." R. at 16. In regard to the final point, plaintiff points out that the ability to grip 30 pounds places plaintiff in the same grip-strength range as a 5-6 year old. *See* Docket No. 13-3 at 4.

probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). In the absence of findings by the ALJ revealing how he specifically weighed the evidence, this Court cannot assess whether substantial evidence applied to the correct legal standards supported the ALJ's conclusions. *See Id.* at 1009. This Court cannot "simply presume the ALJ applied the correct legal standards," nor itself weigh the opinion evidence present in plaintiff's case record. *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003); *Clifton*, 79 F.3d at 1009. On remand, the ALJ should explain what weight, if any, he gives to the treating source opinions which follow the state agency opinion from March 2007.

In doing so, the ALJ will have the opportunity to revisit his credibility determination, which did not reflect a consideration of "all of the available evidence." 20 C.F.R. § 404.1529(c)(1). Moreover, the ALJ's conclusion that Mr. Gadlin was not credible was based, at least in part, upon the fact that the "claimant previously alleged an onset of June 1, 2006, but amended the alleged onset date at the hearing to February 17, 2007. While the right arm injury is now his primary complaint, it had not even occurred at the time of initial filing, which goes against his credibility." R. at 17. The initial claim was based upon plaintiff's learning disorder with borderline intellect, a severe impairment the ALJ found existed. R. at 13. It is not clear how the later amendment of his claim to include the effects of the gunshot undermines plaintiff's credibility. If the ALJ relies upon the same logic on remand, an explanation of its basis should be offered.

Plaintiff also challenges the ALJ's evaluation of his cognitive deficits, arguing that the SVP and GED levels the ALJ determined are not consistent with his documented

11

intellectual deficits.[6]  Because the Court will remand for the reasons outlined above, it will not reach this claimed error.  On remand, the plaintiff can present this argument, and the ALJ will have the opportunity to revisit the issue, if necessary.

      Finally, the Court is disturbed by various arguments made by the Commissioner in support of the ALJ's credibility determination.  The Commissioner argues that the "record demonstrates that the extent of the limitations claimed by plaintiff were not consistent with his daily activities," citing that plaintiff "reported . . . he performed household chores, drove a car, and played basketball with his friends."  Def.'s Response [Docket No. 14] at 27 (citing R. at 17).  Mr. Gadlin reported those activities on February 15, 2007, two days prior to being shot in the arm.  The Commissioner identifies no support or suggestion in the record that plaintiff can do those things now. *Cf.* R. at 26 (where Mr. Gadlin, in response to a question regarding how he uses his right hand in daily life, testified "I don't really use it").  The Commissioner also notes, as an apparent inconsistency undermining plaintiff's credibility, that "[t]he ALJ pointed out that although Plaintiff is right-handed, he reportedly uses his left hand for writing and performing most other activities (Tr. 15)." *Id.*  However, the ALJ did not cite that fact in his credibility determination and, in any event, the fact that plaintiff is using his left hand instead of his dominant right hand to perform most tasks supports, not undercuts, his claim of disabling injury.  Finally, in support of the ALJ's credibility determination, the Commissioner claims that "Plaintiff exhibited drug seeking behavior."  Nowhere does the ALJ decision mention drug seeking behavior.  The Commissioner claims that

---

[6] Mr. Gadlin's full-scale IQ is 76, which places him in the 5th percentile and "point[s] to significant cognitive deficits across most realms of functioning."  R. at 125.

"Plaintiff reported not receiving all of his Percocet from the pharmacy, but the pharmacy reported otherwise (Tr. 225)." *Id.* at 28 n.14. The note in the medical record states "pain 8/10 at its worst. problems with percocet. pt states he couldn'ty [sic] get all of his meds att [sic] one time but the pharm says he did." R. at 225. The Commissioner leaves out the phrase "at one time," which has the effect of making an otherwise ordinary notation look suspicious. Moreover, the Commissioner then states, "Dr. Unruh characterized this inconsistency as a 'problem.'" Def.'s Response [Docket No. 14] at 28 n. 14. Dr. Unruh does no such thing. Rather, as the above-quoted language demonstrates, the word "problems" appears to be a complaint by plaintiff about Percocet. The note cannot be fairly read to suggest that Dr. Unruh believed that there was an "inconsistency" or that Dr. Unruh believed there was a "problem" with plaintiff's credibility. These arguments cross the line from advocacy to distortion of the record.

### III. CONCLUSION

For the reasons stated above, the Court finds that the Commissioner's finding that plaintiff is not disabled under the Act is not based on substantial evidence and, therefore, is REVERSED. This case is REMANDED to the Commissioner for additional proceedings in accordance with this Order.

DATED March 16, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge